IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

OXFORD LENDING GROUP, LLC
1 East Campus View Blvd., Ste. 200
Columbus, Ohio  43235

        Plaintiff

    v.

UNDERWRITERS AT LLOYD'S,
LONDON

C/O STATESIDE UNDERWRITING
AGENCY, INC., authorized agent
29 South LaSalle Street, Suite 530
Chicago, Illinois 60603

C/O MR. STEPHEN MARCUS,
authorized agent
10 South LaSalle Street
Chicago, Illinois 60603-1098

    and

STEWART TITLE GUARANTY
COMPANY
1980 Post Oak Boulevard, Suite 710
Houston, Texas 77056

C/O GERI KAYE, statutory agent
1101 Civic Drive
Walnut Creek, California 94596

    and

PLACER TITLE COMPANY
801 Davis Street
San Elandro, CA 94577

C/O PATRICIA LAFFIN, statutory agent
189 Fulweiler Avenue
Auburn, California 95603

    and

Civil Action No.  10-cv-94

Judge

Magistrate Judge

THE APPRAISAL WORKS                          :
19 Sweetwater Court                          :
Oakley, CA  94561                            :
                                             :
C/O DOUGLAS K. MEW, statutory agent          :
28615 Seamount Drive                         :
Rancho Palos Verdes, California 90275-       :
4753                                         :
                                             :
     and                                     :
                                             :
WILLIAMS APPRAISAL SERVICE                   :
                                             :
C/O TRAVIS L. WILLIAMS SR,                   :
authorized officer                           :
3115 Hood Street                             :
Oakland, CA 94605                            :
                                             :
     and                                     :
                                             :
JACQUELINE SHELTON                           :
3320 Wilson Place                            :
Oakland, CA 94602-2804                       :
                                             :
     and                                     :
                                             :
ARKETHA MUNIR                                :
347 Corbett Avenue                           :
San Francisco, CA 94114                      :
                                             :
     and                                     :
                                             :
TREVOR D. TAPSCOTT                           :
2434 Sullivan Street                         :
San Pablo, CA 94806-1544                     :
                                             :
          *Defendants*                       :

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES
## (JURY DEMAND ENDORSED HEREON)

Plaintiff Oxford Lending Group, LLC, by and through counsel, hereby files this

Complaint against the Defendants alleging as against each: 1) Defendant Underwriters at

Lloyd's of London for (i) declaratory judgment (ii) breach of contract, and (iii) bad faith

claims handling; 2) Defendant Stewart Title Guaranty Company for (i) declaratory judgment, and (ii) breach of contract; 3) Defendant Placer Title Company for (i) breach of contract, (ii) breach of fiduciary duty, and (iii) negligence; 4) Defendants The Appraisal Works and Williams Appraisal Service for (i) breach of contract, and (ii) negligence and (5) Defendant's Jacqueline Shelton, Arketha Munir and Trevor Tapscott for fraud and conspiracy to commit fraud. For its Complaint against Defendants, Plaintiff Oxford Lending Group, LLC states and avers as follows:

<u>JURISDICTION AND VENUE</u>

1.      Oxford Lending Group, LLC ("Oxford") is a limited liability company registered in the State of Ohio with its principal place of business in Columbus, Franklin County, Ohio at all times pertinent to the matters herein.

2.      Underwriters at Lloyd's, London ("Lloyds") is a foreign company, with its principal place of business within the United States being in Chicago, Illinois. Lloyds insures entities and/or individuals throughout the United States including in Columbus, Franklin County, Ohio. Lloyds is subject to jurisdiction in Ohio as it provides insurance to Ohio individuals and businesses and has purposefully availed itself of the privilege of doing business in Ohio.

3.      Stewart Title Guaranty Company ("Stewart") is a Texas corporation, with its principal place of business in Houston, Texas, that provides title guaranty and insurance to entities and/or individuals throughout the United States including Columbus, Franklin County, Ohio. Stewart is subject to jurisdiction in Ohio as it provides goods and/or services to Ohio individuals and businesses and has purposefully availed itself of the privilege of doing business in Ohio.

4.      Placer Title Company ("Placer") is a California company, with its principal place of business in California, that provides loan closing services for entities located throughout the United States, including entities located in Franklin County, Ohio. Placer is subject to jurisdiction in Ohio as it provides goods and/or services to Ohio individuals and businesses and has purposefully availed itself of the privilege of doing business in Ohio.

5.      The Appraisal Works ("Works") is a California company, with its principal place of business in Oakley, California, that provides appraisal services for entities located throughout the United States, including entities located in Franklin County, Ohio. Works is subject to jurisdiction in Ohio as it provides goods and/or services to Ohio individuals and businesses and has purposefully availed itself of the privilege of doing business in Ohio.

6.      The Williams Appraisal Service ("Williams") is a California company, with its principal place of business in Oakley, California, that provides appraisal services for entities located throughout the United States, including entities located in Franklin County, Ohio.  Williams is subject to jurisdiction in Ohio as it provides goods and/or services to Ohio individuals and businesses and has purposefully availed itself of the privilege of doing business in Ohio.

7.      Defendant Jacqueline Shelton ("Shelton") is a resident of California. She is subject to jurisdiction in Ohio on the basis that she participated in a mortgage fraud scam perpetrated in Ohio against an Ohio lender.

8.      Defendant Arketha Munir ("Munir") is a resident of California. She is subject to jurisdiction in Ohio on the basis that she participated in a mortgage fraud scam perpetrated in Ohio against an Ohio lender.

9.     Defendant Trevor Tapscott ("Tapscott") is a resident of California. He is subject to jurisdiction in Ohio on the basis that he participated in a mortgage fraud scam perpetrated in Ohio against an Ohio lender.

10.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

11.     Venue is proper in the Southern District of Ohio, Eastern Division pursuant to 28 U.S.C. § 1391(a)(2). A substantial part of the events giving rise to this action occurred in this District. To wit, Lloyds breached its contract and handled the underlying claim in bad faith in Ohio, and the policy of insurance and bond specifically provide that Ohio law is to be applied. Stewart provided title guaranty and a closing protection letter to Oxford in Ohio. Defendants Placer, Works, and Williams provided goods or services to Oxford in Ohio. Shelton, Munir, and Tapscott committed and conspired to commit fraud against Oxford in Ohio.

12.     Venue is proper in the Southern District of Ohio, Eastern Division pursuant to 28 U.S.C. § 1391(a)(3). Defendants Lloyds and Stewarts are both subject to personal jurisdiction in this venue by providing insurance services and title guaranties to Oxford. Defendants Shelton, Munir, and Tapscott are subject to jurisdiction in Ohio by perpetrating and subsequently committing fraud in Ohio against an Ohio company.

13.     Venue is proper in the Southern District of Ohio, Eastern Division on the basis that there is no more convenient forum for this action. This matter involves breaches of contract, negligence, fraud, and bad faith claims by Defendants located in three different states. The underlying matter giving rise to this claim is Oxford's indemnification of Flagstar Bank, which is headquartered in Troy, Michigan. Oxford's indemnification

stemmed from its alleged negligence and obligation to re-purchase a loan from Flagstar pursuant to a warehouse funding agreement, which arose as a result of a mortgagor defaulting on her home loan. The mortgagor and the mortgaged property are located in California. As such, the Plaintiff is located in Ohio; Defendants are located in Illinois, Texas, and California; the underlying obligation forming the basis for this action involves a Michigan company; and the property is located in California. For reasons of judicial economy alone, venue is proper in the Southern District of Ohio, Eastern Division.

FACTS COMMON TO ALL CLAIMS

14.     Plaintiff incorporates the preceding allegations as if fully rewritten herein.

15.     On June 27, 2006, Oxford entered into a Mortgage Warehousing and Security Agreement ("Warehousing Agreement") (attached as Exhibit A) with Flagstar Bank, FSB ("Flagstar").

16.     Pursuant to the terms of the Warehousing Agreement, Oxford had a credit line of $3,000,000 for first mortgages and $300,000 for second mortgages.  (Exhibit A).

17.     Oxford is a mortgage broker whereby its customers apply for mortgages from Oxford who then advances funds, through the credit line made available to it by Flagstar, to the customer/borrower pursuant to a mortgage loan. Upon the closing of a loan, if the loan meets the underwriting requirements of Flagstar, the loan will be purchased by Flagstar. Upon purchase of the loan by Flagstar, Oxford repays its credit line. (Exhibit A, Section 4.6)

18.     Pursuant to the terms of the Warehousing Agreement, Oxford was obligated to repay each Advance for a mortgage loan upon the earlier of 1) the date the mortgage loan is sold to Flagstar or another purchaser, 2) thirty (30) days from the date of the Advance, or 3) the date of a mandatory prepayment triggered by an event of default. (Exhibit A, Section 3.3(ii)).

19.    In most cases Flagstar will underwrite a loan prior to approval of such loan for the customer/borrower. Such pre-underwriting insures that Flagstar will purchase the loan upon closing.

20.    While the mortgage loans funded by Oxford through its credit line are subject to purchase commitments by Flagstar, the majority of loan purchases made by Flagstar are not reflected in individual written purchase commitment documents due to the sheer volume of such purchases.   Rather, the purchases are pursuant to the "Correspondent Lending Mortgage Purchase Agreement ("Purchase Agreement").  (Exhibit B)

21.    When a loan is purchased by Flagstar, it will immediately repay the credit line from which Oxford funded the loan. In return, Oxford will assign the mortgage to Flagstar.

22.    When Flagstar purchases a loan from Oxford it requires Oxford warrant and/or guaranty the loan. If a borrower defaults on a mortgage, Flagstar will foreclose on the loan. Oxford may repay any deficiency realized by Flagstar following the foreclosure proceedings.  (Exhibit B)

23.    In or about December 2007, Jacqueline Shelton, or a person purporting to be Shelton, called Oxford to inquire about obtaining a mortgage loan for the purchase of residential property in Oakland, California.

24.    Shelton's contract purchase price, dated January 26, 2008 was $739,000, exclusive of closing costs.  She agreed to make a $95,207.01 down payment.  Shelton obtained the remainder of the funds needed to purchase the property and pay for the closing costs via a loan from Oxford. Oxford funded the loan through its Flagstar warehouse line.

25.    Because Oxford needed assurance that it could sell the mortgage to Flagstar, the loan application was simultaneously underwritten by Flagstar and approved prior to loan approval being given to Shelton. Following the loan closing, the mortgage loan was

purchased by Flagstar and Oxford's credit line was repaid in accordance with the terms and conditions of the Warehousing Agreement. (See, Note assigned to Flagstar, attached as Exhibit C).

26.     The loan closing was conducted by Placer. Oxford provided Placer with the closing information and documentation along with written closing instructions ("Instructions").

27.     The Instructions given to Placer by Oxford required that the total amount due from Shelton at closing was $774,903.55, an amount which included the purchase price as well as settlement charges and taxes.  The Instructions required the buyer (Shelton) provide a $95,207.01 down payment consisting of her own funds and provide a $675,990.00 mortgage (pursuant to the purchase contract, Shelton also received a $4,000.00 credit from Tapscott for closing costs).

28.     Pursuant to the Instructions, the amount due to the seller, Trevor D. Tapscott, was $739,271.68.  Of this amount, $4,000.00 was the above mentioned credit to Shelton for closing costs, $497,885.99 was to be wired to Washington Mutual to pay off Tapscott's mortgage, and $3,407.88 was to be paid to Alameda County Tax Collector. The remaining funds, $224,369.91, were to be paid to Tapscott.

29.     Although Placer was provided with explicit written Instructions, including closing and disbursement requirements, it altered the closing documents in several material aspects.

30.     Placer altered the closing documents to change or misrepresent the entities paying or receiving funds. Fees, line items and/or service providers listed on the Preliminary HUD-1 Settlement Statement provided by Oxford in the loan closing package were changed and/or renamed by Placer.

31.    Placer allowed a party other than Shelton to pay the down payment.  This loan was underwritten and approved on the condition that Shelton was to pay the down payment using her own funds. When the loan closed at Placer, the down payment was paid in the form of a certified check remitted by an individual named Arketha Munir.

32.    Placer altered the documents to reflect that $150,000.00 of Tapscott's proceeds, which were previously intended to be paid to Tapscott, were instead paid to an entity by the name of "Corporations, Inc."

33.    Since the date the loan closed, April 15, 2008, Shelton has failed to pay the mortgage in accordance with her obligations as mortgagor.

34.    Upon information and belief, Tapscott is/was a local builder in Oakland, California.  Tapscott completed the construction of the subject home prior to entering into the sales contract with Shelton.   Tapscott was unable to sell the home for an extended period of time. The market value of the house, as reflected by a subsequent appraisal, was significantly lower than Tapscott's asking price.  In an attempt to unload the home, Tapscott sought the help of Arketha Munir, who is/was a real estate agent in Oakland, California. Upon information and belief, Tapscott and Munir concocted a scam enabling Tapscott to sell the property so that they could profit from the transaction.

35.    Upon information and belief, Tapscott and Munir enlisted Shelton, an acquaintance of Munir, to serve as buyer/borrower/mortgagor.  Tapscott and Munir forged documents and signatures to allow Shelton to be approved for the mortgage loan.

36.     Munir or Shelton, or both, completed the initial loan application and produced related documents, including all RESPA documents, and returned same to Oxford.  Among these documents were a fictitious driver's license and social security card. Recognizing that Shelton needed a source of income in order to be approved for the loan,

fictitious W-2 statements and paystubs from Elijah Painting Company were created. A telephone number that was an "answering service" for Elijah Painting Company was established so that when Oxford, or Flagstar, contacted the "employer" they would be able to verify Shelton's alleged employment. When the underwriter requested rent verification, fictitious documents to verify rent being paid by Shelton were created and produced. Fictitious documents verifying sufficient assets to pay the down payment, which included documents purporting to show Shelton had investment holdings with "Franklin's Investment Company" were also created.

37.     Throughout the loan application and closing process, numerous documents were signed by "Jacqueline Shelton." However, documents evince that there are three or more different signatures for "Jacqueline Shelton." Upon information and belief, all of the "Real Estate Documents" and closing documents, including the mortgage and note, contain the forged signature of Jacqueline Shelton.

38.     Based on the information and fraudulent documents provided by Shelton, Munir, and/or Tapscott, Oxford and Flagstar approved the loan.

39.     Oxford became aware of this matter on or about November 18, 2008 when it was notified by Flagstar. A formal written demand was sent by Flagstar on December 18, 2008.

40.     Upon information and belief "Corporations, Inc." does not exist. It appears that Tapscott's actual out-of-pocket costs in the construction of this home were approximately $497.885.99, the amount of the mortgage payoff to Washington Mutual. It appears Tapscott's "profit" may have been the $74,369.91 paid to him at closing. The $150,000.00 that went to Corporations Inc. was used to reimburse Munir for the down payment, as well as pay her a "profit" for her participation in the scam.

41.     Flagstar has foreclosed on the home and has demanded that Oxford indemnify it for its losses following foreclosure proceedings.

42.     Flagstar's original demand was for the repurchase of the mortgage loan pursuant to the terms of the Purchase Agreement and for Oxford's alleged negligence stemming from the underwriting of the subject mortgage loan application. Because of the foreclosure and sale of the subject property, Flagstar's current demand is limited to indemnification for its loss, which is predicated on alleged contractual obligations as well as alleged negligence.

43.     In December, 2009, Flagstar received funds from Oxford in the amount of $350,000 for partial indemnification of its loss. Oxford held a bank account with Flagstar that contained $350,000. Flagstar has removed those funds from Oxford's account in partial satisfaction of Oxford's alleged obligation to Flagstar.

44.     Effective January 24, 2010, Oxford and Flagstar entered into a settlement agreement resolving all disputes between them regarding the Shelton loan. The claims released by Flagstar include, but are not limited to, breach of warranty, breach of contract, duty to re-purchase notes, and negligence. The terms of the settlement provide that 1) Flagstar will retain the $350,000 previously removed from Oxford's account in partial satisfaction of Oxford's alleged obligation, and 2) Oxford will pay Flagstar an additional $68,097.27 by January 31, 2010.

45.     As of January 31, 2010, Oxford has sustained a loss of $418,097.27 in the form of payments made to Flagstar in full and final settlement of all claims made by Flagstar against Oxford. Oxford has sustained additional losses including, but not limited to, loss of business and attorney fees.

## COUNT I
### (*Declaratory Judgment – Lloyds Bond*)

46.      Plaintiff incorporates the preceding allegations as if fully rewritten herein.

47.      At all times pertinent hereunder, Oxford (referred to as the "Assured") had a Special Mortgage Banker's Bond ("Bond") issued by Lloyds (referred to as "Underwriters") that provided coverage to Oxford pursuant to the terms and conditions of the Bond. The policy period for the Bond was January 31, 2008 through January 31, 2009. The Bond has been renewed annually thereafter. The Bond has an aggregate policy limit of $1,000,000, but no claims have been paid under the Bond; thus, the full $1,000,000 is available for defense and/or indemnification of this matter. Pursuant to the Insuring Clause that affords defense and indemnification coverage to Oxford, there is a $15,000 deductible that applies. (A copy of the Bond is attached as Exhibit D).

48.      The Lloyds' Bond provides, in pertinent part:

### INSURING CLAUSES

The Underwriters hereby undertake and agree, subject to the terms, definitions, exclusions, limitations, conditions and endorsements of this Bond to indemnify the Assured for:

* * *

FORGED DOCUMENTS

Insuring Clause 5

Direct financial loss sustained by the Assured subsequent to the Retroactive Date and discovered by the Assured during the Bond Period by reason of and directly caused by

(a)      the Assured having relied upon a Forged Signature on or Fraudulent Alteration of any original Mortgage, Trust Deed, Note or Title Policy received by the Assured in connection with a Real Estate Loan

(i)       originated by the Assured, or

(ii)    originated by a person other than the Assured and purchased by the Assured, or

(iii)    prepared, directly funded and closed by a person other than the Assured in the name of the Assured, which Real Estate Loan is held by the Assured for its own account, or

(b)    The Assured being legally liable to repurchase a Real Estate Loan from an Investor as the direct result of a Forged Signature on or Fraudulent Alteration of

(i)    any original Real Estate Documents received by the Assured in connection with a Real Estate Loan originated by the Assured, or

(ii)    any original Mortgage, Trust Deed, Note or Title Policy received by the Assured in connection with a Real Estate Loan originated by a person other than the Assured and purchased by the Assured or prepared, directly funded and closed by a person other than the Assured in the name of the Assured.

Special Condition:

It is agreed that as a condition precedent to coverage under this Insuring Clause that the Assured made or purchased the Real Estate Loan and acquired the items stated above in good faith and in the ordinary course of its business and that there was actual physical possession of the said items by the person closing the Real Estate Loan at the time of the closing and by the Assured at the time of the acquisition of said Real Estate Loan.

* * *

## AGREEMENTS

### A.  COURT COSTS AND ATTORNEY'S FEES

### 1. INDEMNIFICATION

The Underwriters shall indemnify the Assured against court costs and reasonable attorneys' fees incurred and paid by the Assured in defending any suit or legal proceeding brought against the Assured which results in a loss to the Assured covered by Insuring Clauses, 1, 2, 3, 4, 5, 9, 11 or 12 of this Bond in excess of any Deductible.  Court costs and attorneys' fees indemnified to the Assured shall be part of and not in addition to the applicable Aggregate Limit of Indemnity or the applicable sub-limit and payments made under this Bond including payments of such court costs and attorneys' fees shall reduce the amount of the applicable Aggregate Limit of Indemnity or applicable sub-limit shown in the Schedule.

\* \* \*

# DEFINITIONS

\* \* \*

(q)    Forged Signature means the handwritten signing or endorsing of the name of another genuine person with intent to deceive; it does not include the signing or endorsing in whole or in part of one's own name, with or without authority, in any capacity, for any purpose.

(r)    Fraudulent Alteration means a material alteration to an instrument for a fraudulent purpose by a person other than the person who prepared the instrument.

\* \* \*

(u)    Investor means a corporation, association, partnership or natural person purchasing Real Estate Loans sold or originated by the Assured and including but not limited to life insurance companies, pension funds, commercial banks, savings banks, savings and loan associations, state housing finance agencies, and any Secondary Market Institution.

\* \* \*

(z)    Real Estate Documents mean any original

(i) Mortgage, Trust Deed, Note, Title Policy, Deed, Applicable for Mortgage Loan, Verification of Employment, Verification of Deposit, documents evidencing private mortgage insurance, Federal Housing Administration insurance or Veteran's Administration guarantee, and

(ii) Underwriting documents including financial statements, rent rolls, operating statements on the asset (if an existing property), specifications for the real property, surveys, or leases in connection with a loan on commercial real property including a real estate construction loan, and

(iii) Appraisal, mortgage commitment, or borrower's acceptance of commitment, and

(iv) Uniform Commercial Code financing statement pursuant to U.C.C. 9-402 to perfect a security interest in real property excluding a security agreement, and

(v) Letter of credit, assignment of a certificate of deposit or bank account, and any similar instrument pledged to the Assured as collateral for a Real Estate Loan, and

(vi) Land trust documents, and

(vii) Owner's sworn statement, architect's certificate, inspection engineer's report, lien waiver, soil test report, and draw request, provided that said items are obtained by the Assured in connection with a construction loan.

(aa)   Real Estate Loan means a loan or transaction in the nature of a loan or extension of credit secured by a note and mortgage or Deed of Trust on a 1 to 4 family residential property or on multi-family property or commercial real property, including a real estate construction loan.

(Exhibit D).

49.      Oxford has satisfied all of the obligations set forth in the Bond. To wit, Oxford has exercised due diligence in making reasonable efforts to mitigate its loss; it provided Lloyds with written notice of the loss within sixty (60) days of discovery; it has provided a proof of loss within six (6) months of discovery that included the pertinent requirements set forth in the Bond; and it has brought this legal proceeding more than ninety (90) days since the proof of loss was submitted and less than twenty-four (24) months from the date of discovery; it has cooperated pursuant to the terms of the Bond.

50.      Flagstar has demanded, among other allegations, that Oxford indemnify Flagstar on the basis that Shelton has failed to pay the mortgage pursuant to the terms of the Mortgage and accompanying Note and as a result of the forged signature on and/or fraudulent alteration of Real Estate Documents, as defined in the Bond.

51.      Due to the fact that multiple signatures, clearly evincing that numerous documents were signed by more than one person, appear on the documents, it is evident that numerous Real Estate Documents contain forged signatures.

52.      Numerous Real Estate Documents, including underwriting documents such as financing statements, rent verification documents, employment verification documents,

tax records, social security cards, and other financial records, were fraudulently altered in order to induce Oxford, and subsequently Flagstar, into approving the loan.

53.     The Loan Closing Documents, originally prepared by Oxford or Flagstar, were fraudulently altered to reflect changes such as who was paying the down payment and who was receiving the proceeds from the sale.

54.     Oxford's liability to Flagstar is a direct result of the forged signatures on and/or fraudulent alteration of Real Estate Documents.

55.     Although Oxford has complied with all of the conditions of the Bond, and although the Bond clearly and unequivocally provides defense and indemnification coverage to Oxford for this claim, Lloyds has failed to accept coverage.

56.     Pursuant to the terms of the Bond, Oxford is entitled to declaratory judgment establishing that Lloyds has an obligation to indemnify Oxford for its indemnification of Flagstar. Lloyds is further obligated to indemnify Oxford for all legal fees it has incurred in litigating and/or resolving this matter.

## COUNT II
### (*Declaratory Judgment – Lloyds Professional Services Liability Policy*)

57.     Plaintiff incorporates the preceding allegations as if fully rewritten herein.

58.     At all times pertinent hereunder, Oxford (referred to as the "Insured") had a Professional Services Liability Policy ("Policy") issued by Lloyds (referred to as the "Company") that provided coverage to Oxford for its Mortgage Company Professional Liability pursuant to the terms and conditions of the Policy.[1] The policy period for the

---

[1] Lloyds has actually issued two Professional Services Liability Policies to Oxford. The first Policy (Exhibit E), Number SUA00201540, was issued to Oxford and Bi-Weekly Equity Services, Ltd. The second Policy (Exhibit F), Number SUA00201561, was issued only to Oxford. The terms and conditions of both policies are identical. The only difference, other than the potential insureds, is the policy limit. The former has a $1,000,000 aggregate limit. The latter has a $100,000 per occurrence, $300,000 general aggregate limit. Because the terms are the same, this Complaint will only address the former.

Policy was January 31, 2008 through January 31, 2009. The Policy has been renewed annually thereafter. Pursuant to the Insuring Clause that affords defense and indemnification coverage to Oxford, there is a $10,000 deductible (i.e. retention) that applies. (A copy of the Policies are attached as Exhibits E and F).

59.    The Lloyds' Policy provides, in pertinent part:

I.    INSURING AGREEMENT

The Company will pay on behalf of the INSURED LOSS in excess of the retention stated in Item 4 of the Declarations which the INSURED shall become legally obligated to pay as a result of any CLAIM first made against the INSURED during the POLICY PERIOD for a WRONGFUL ACT that occurred on or after the retroactive Date stated in Item 6 of the Declarations.

II.    DEFENSE AND SETTLEMENT

Subject to Article V.B., the Company shall have the right and duty to defend any CLAIM against the INSURED to which this insurance applies, even if any of the allegations of the CLAIM are groundless, false or fraudulent.

The Company shall have the right to negotiate the settlement of any CLAIM, whether within or above the Retention, but the Company shall not commit the INSURED to any settlement without the INSURED'S consent, such consent not to be unreasonably withheld. The INSURED shall not admit liability for or settle any CLAIM or incur any DEFENSE COSTS without the written consent of the Company, such consent not to be unreasonably withheld. If the INSURED refuses to consent to any settlement recommended by the Company and agreed to by the claimant, and elects to contest any CLAIM or continue any legal proceedings in connection with such CLAIM, then, subject to the Limit of Liability of this Policy, the Company's liability for the CLAIM shall be limited to the amount in excess of the Retention which the company would have contributed to the settlement had the INSURED consented to such settlement plus the DEFENSE COSTS incurred up to the date of such refusal.

III.    DEFINITIONS

* * *

B.    "WRONGFUL ACT" means any actual or alleged negligent act, negligent error or negligent omission committed by the INSURED solely in the performance of or failure to perform professional services for others in the INSURED'S Profession as stated in Item 1.A. of the Declarations.

17

C.     "Loss" means money damages, settlements, and DEFENSE COSTS. LOSS shall not include:

      1.     punitive or exemplary damages or the multiplied portion of a multiplied damages award;

      2.     criminal or civil fines or penalties;

      3.     taxes;

      4.     matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

* * *

E.     "DEFENSE COSTS" means reasonable and necessary legal fees and expenses incurred with the approval of the company in connection with the investigation, adjustment, settlement, defense or appeal of a CLAIM made against an INSURED for a WRONGFUL ACT, and shall include the cost of attachment or similar bonds. Payment of DEFENSE COSTS by the Company shall reduce, and may exhaust, the Limit of Liability under this Policy.

"DEFENSE COSTS" shall not include salaries, wages, fees, overhead, overtime or benefit expenses incurred by or associated with the INSUREDS.

F.     "CLAIM" means a written demand for money damages received by an INSURED, including service of suit and the institution of administrative or arbitration proceedings.

* * *

(Exhibit E).

60.     Oxford has satisfied all of the obligations set forth in the Policy. To wit, Oxford has paid all premiums due and owing; it has fully cooperated with Lloyds requests, of which there have been none; it has not breached any of the terms and conditions of the Policy; it has sought the consent of Lloyds to settle the claim made against it by Flagstar, which such consent has been withheld by Lloyds.

61.     Flagstar has made a demand against Oxford to indemnify Flagstar for its loss. Such demand has been made in accordance with its alleged obligation to repurchase the

loan, as well as, Oxford's alleged liability stemming from its alleged negligence in the underwriting of the subject loan.

62.    The date of Flagstar's original demand was on or about December 18, 2008, which was promptly submitted to Lloyds for investigation and coverage.

63.    Lloyds acknowledged receipt of Oxford's claim under the Policy no later than January 22, 2009, at which time counsel for Lloyds sent an acknowledgement of the claim to Oxford.

64.    Although Lloyds was aware of this claim no later than January 22, 2009, Lloyds did not provide Oxford with any written communication regarding the status of the claim until December 8, 2009, at which time Lloyds advised that the claim was premature as Flagstar's demand to be indemnified for its loss, dated one year prior, did not actually constitute a "demand for money damages." Without a "demand for money damages," Lloyds has informed Oxford that no "Claim" has been made.

65.    Although Oxford has complied with all of the conditions of the Policy, and although the Policy provides defense and indemnification coverage to Oxford for this claim, Lloyds has failed to accept coverage, and indeed has provided Oxford with a notice of possible denial.

66.    Based on Flagstar's claim against Oxford being based, in part, on Oxford's alleged negligence, there are no exclusions within the Policy that would preclude coverage.

67.    Pursuant to the terms of the Policy, Oxford is entitled to declaratory judgment establishing that Lloyds has an obligation to indemnify Oxford for its indemnification of Flagstar. Lloyds is further obligated to indemnify Oxford for all legal fees it has incurred in defending, litigating, and/or resolving this matter

## COUNT III
### (*Breach of Contract – Lloyds*)

68.    Plaintiff incorporates the preceding allegations as if fully rewritten herein.

69.    From January 31, 2008 through the present date, Oxford has had in effect two insurance policies (the aforementioned Policy and Bond) with Lloyds.

70.    The Bond issued by Lloyds provides coverage to defend and indemnify Oxford for covered losses.

71.    Oxford has sustained a loss as a result of forged signatures and/or fraudulent alteration of real estate documents and other documents as set forth in Insuring Clause 5 of the Bond and as defined in the Bond.

72.    Lloyds has a contractual obligation to indemnify Oxford for covered losses, as well as, defend or pay for the defense of covered claims regardless of whether or not Oxford is ultimately liable for such claims.

73.    Lloyds, having had nearly one year to investigate this matter, has utterly refused to defend and indemnify Oxford as is its obligation pursuant to the Bond.

74.    Lloyds has breached the contract by failing to fulfill its obligation to defend and indemnify Oxford in this matter.

75.    Pursuant to the terms and conditions of the Policy, Lloyds has a contractual obligation to defend and indemnify Oxford for covered claims, as set forth in the Policy.

76.    Oxford has indemnified Flagstar for losses Flagstar sustained due to Oxford's alleged negligence. The indemnification of Flagstar by Oxford was in the form of payment of money damages.

77.    Lloyds, having had nearly one year to investigate this matter, has utterly refused to defend and indemnify Oxford as is its obligation pursuant to the Policy.

78.     Lloyds notified Oxford of its coverage assessment for the first time on December 8, 2009 (nearly one year after the claim was initially reported). Astonishingly, Lloyds has made the determination (after twelve months of contemplation) that the demand letter from Flagstar is not a "Claim" as that term is defined in the Policy because it does not demand money damages.

79.     Lloyds has breached the contract by failing to fulfill its obligation to defend and indemnify Oxford in this matter.

80.     As a direct and proximate result of Defendant Lloyds' breach of contract Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

COUNT IV
(*Bad Faith Claims Handling – Lloyds*)

81.     Plaintiff incorporates the preceding allegations as if fully rewritten herein.

82.     Oxford first notified Lloyds on or about December 18, 2008 of the underlying matter involving the Shelton loan and the liability that it may have to repurchase the loan from Flagstar or indemnify Flagstar.   Lloyds acknowledged receipt of the notice, by and through counsel, on or about December 29, 2008.

83.     In December, 2008, Lloyds was provided with a demand letter from Flagstar, attached as Exhibit G[2], with regard to the Shelton loan. Lloyds received the demand letter on or about January 5, 2009, and it acknowledged receipt on January 22, 2009. In its acknowledgment letter (attached as Exhibit H) Lloyds informed Oxford it would conduct its investigation and in the interim Oxford should "take al (sic) such steps as are necessary to

---

[2] Numerous exhibits attached to this Complaint contain certain information that has been redacted. This information includes, but is not limited to, loan numbers; account numbers, and social security numbers. Unredacted copies of these documents will be made available to all parties, and upon Order of the Court will be filed under seal.

protect its interests." Furthermore, as it relates to the investigation of coverage under the Bond, Lloyds advised "we will let you know whether the Underwriters need additional documents or information to assess the Bond claim." (Exhibit H).

84.     On February 13, 2009, Oxford, through counsel, sent e-mail correspondence to Lloyds, through counsel, requesting copies of the Policy and inquiring of any Proof of Loss requirements for making claims under the Policy. Counsel for Lloyds responded on the same date, via two e-mails, providing the Policy and stating that no Proof of Loss was required to make a claim under the Policy.

85.     Oxford prepared a Proof of Loss and sent same, through counsel, to Lloyds on March 31, 2009. Lloyds acknowledged receipt of the Proof of Loss, through counsel, on April 2, 2009. (Exhibit I) Lloyds informed Oxford "[w]e … will be in contact if any further documentation or information is needed from [Oxford]."

86.     Having received no response from Lloyds for over two months (63 days), Oxford, through counsel, inquired as to the status of the "coverage investigation" on June 4, 2009. Lloyds responded, through counsel, on June 9, 2009 stating "Underwriters are still in the process of considering coverage of the claim and we will advise the Insured when a coverage determination has been made." (Exhibit J)

87.     Without any further response from Lloyds for an additional one hundred and twelve (112) days, Oxford, through counsel, sent correspondence dated October 30, 2009 to Lloyds, through counsel, inquiring as to the status of the coverage investigation and providing Lloyds with a copy of the proposed settlement agreement between Flagstar and Oxford. (Exhibit K) The correspondence was sent by regular mail and e-mail to Lloyds' counsel.

88.     On or about the same day the letter (Exhibit K) was sent to Lloyd's counsel, Oxford's counsel called Lloyds' counsel to inquire further into the status of the coverage investigation. For the first time since November, 2008 when the claim was first reported to Lloyds, Oxford was informed that Lloyds was going to deny coverage under the Policy. However, Lloyds was unable to provide an assessment of coverage under the Bond. For the first time since the Proof of Loss was submitted in March, 2009, Lloyds now sought additional information, which it could have requested months earlier.

89.     The documentation and information was provided to Lloyds on November 13, 2009 via email correspondence. (Exhibit L). In addition to providing the requested documentation, Oxford inquired about any contractual requirement that Lloyds provide consent to any settlement Oxford may enter into with Flagstar. Lloyds did not respond to this correspondence.

90.     Oxford sent an e-mail, through counsel, to Lloyds, through counsel, on November 17, 2009. (Exhibit M) Oxford noted the "Consent to Settle" provision in the Policy. Oxford informed Lloyds that Flagstar was terminating its Warehouse line of credit, which will result in substantial losses to Oxford as it is the lifeblood of their operation. In order to keep the Warehouse line of credit, Oxford needed to resolve the Shelton loan matter with Flagstar immediately and needed Lloyds' consent to settle by the following day. Lastly, Lloyds was informed that its claim handling was in violation of Ohio law.

91.     Lloyds responded that same day (at 7:02 PM) informing Oxford, "Underwriters have not been provided with a reasonable amount of time to respond to Oxford's request for consent and cannot do so within the time imposed in your email." (Exhibit N). Lloyds' response did not address whether or not the prior eleven (11) months provided it with sufficient time to make such a determination.

92.     Oxford, through counsel, informed Lloyds, through counsel, on November 18, 2009 that Ohio law has held that the dilatory practices engaged in by Lloyds in the handling of this claim constitutes unfair trade practices relative to claims handling and has been held to be bad faith claims handling in Court. (Exhibit O) Lloyds did not respond to this correspondence.

93.     Given the fact that Lloyds refused to respond to Oxford's correspondence, Oxford, through counsel, once again sent correspondence on December 2, 2009 detailing the failure of Lloyds to fairly handle the claim in good faith and informing Lloyds of the substantial damage that Lloyds' action has caused. (Exhibit P)

94.     Given the numerous demands Oxford placed upon Lloyds for a coverage determination and requesting that Lloyds defend and indemnify Oxford in this matter, Lloyds finally provided Oxford with its assessment of the claim on December 8, 2009. (Exhibit Q). While Lloyds has not actually denied either claim, its coverage assessment is the functional equivalent of a bad faith denial of coverage.

95.     With regard to the Policy, Lloyds has made several determinations that reflect its bad faith claims handling and bad faith "denial" of the claim.

96.     First, Lloyds asserts it has no obligation to pay any Loss, including an obligation to defend Oxford, until Oxford has satisfied its $10,000 retention, which includes attorney fees. (Exhibit Q). Oxford has paid far more than $10,000 in attorney fees and Lloyds has been informed of this fact. Lloyds has been informed that attorney fees have exceeded $15,000. In any event, the retention relative to a claim valued in excess of $700,000 is a formality and has nothing whatsoever to do with coverage.

97.     Second, Lloyds has asserted that Flagstar's demand that it be indemnified by Oxford is not a "written demand for money damages;" thus, there has been no "claim"

made against Oxford. (Exhibit Q). Because "no claim" has been made there is no coverage, according to Lloyds. This determination took approximately twelve (12) months to make. Had Lloyds notified Oxford of what could only be considered a form over substance defense Oxford could have and would have obtained a written demand from Flagstar for "money damages."

98.    Third, Lloyds made a determination that even if a "claim" is made there would be no coverage because it stems from a breach of a warranty or guarantee and requires Oxford to repurchase the loan. (Exhibit Q).  Lloyds, acting in bad faith, has utterly refused to address the possibility that Oxford may very well be liable to Flagstar on multiple grounds, which includes negligence in the underwriting of the subject loan. Oxford's alleged obligation to repurchase the loan pursuant to a contract is but one potential cause of action Flagstar could assert. Lloyds has failed to accept and even consider the possibility that Oxford may be liable to Flagstar for "wrongful acts" as defined in the policy. Moreover, because Flagstar foreclosed on the home and sold the property, there has been no "repurchase" by Oxford; rather, Oxford has indemnified Flagstar for its alleged negligence and contractual obligations.

99.    Notwithstanding the fact that Lloyds decided it would view the allegations as narrowly as it desired, Lloyds utterly refused to communicate with Oxford relative to its investigation of the claim and failed to inquire as to other potential causes of action, which is its obligation under Ohio law.

100.    With regard to the Bond, Lloyds continues its refusal to make a coverage determination. Such dilatory tactics are in bad faith and have resulted in Oxford sustaining substantial damages.

101.    First, Lloyds has again asserted that Oxford has not sustained a loss. (Exhibit Q). Even though the policy provides coverage for the defense and indemnification of an insured, Lloyds is refusing to provide any coverage until Oxford has a judgment against it or settles a claim. Yet, Lloyds refuses to consent to any settlement. Whether or not Oxford has sustained a loss, which it has, does not prevent Lloyds from determining and accepting coverage upon the occurrence of a loss. Lloyds has all the information it needs to accept coverage and inform Oxford that there is coverage and that it will be indemnified.

102.    Second, Lloyds waited seven and a half (7½) months after receipt of the proof of loss before requesting any additional information. When the information was requested, it was provided within one (1) week. Nevertheless, Lloyds now seeks "more" information even though the information is requests it already has. (Exhibit Q) Even though Lloyds is seeking information that is duplicative in part, this information could have and should have been requested seven (7) months ago.

103.    Lloyds has conducted unfair and deceptive acts as set forth in R.C. §3901, *et seq.* and/or O.A.C. §3901, *et seq.* By way of example, and not by way of limitation, Lloyds has violated O.A.C. §3901-1-07(12), which provides:

(12) Failing to advise the first party claimant or the claimant's authorized representative, in writing or by other means so long as an appropriate notation is made in the claim file of the insurer, of the acceptance or rejection of the claim, within twenty-one days after receipt by the insurer of a properly executed proof of loss;

(a) Failing to notify such claimant or the claimant's authorized representative, within twenty-one days after receipt of such proof of loss, that the insurer needs more time to determine whether the claim should be accepted or rejected;

(b) Failing to send a letter to such claimant or, the claimant's authorized representative, stating the need for further time to investigate the claim, if such claim remains unsettled ninety days from the date of the initial letter setting forth the need for further time to investigate;

(c) Failing to send such claimant or authorized representative every ninety days after the first ninety-day claim investigation period, a letter setting forth the reasons additional time is needed for investigation, unless the delay is caused by factors beyond the insurer's control;

104.   Lloyds failed to accept or reject Oxford's claim within twenty-one (21) days within receipt of the properly executed Proof of Loss.

105.   Lloyds failed to notify Oxford within twenty-one (21) days that it needed additional time to investigate so as to make a determination to accept or reject the claim.

106.   Lloyds failed to notify Oxford within ninety (90) days from the date of the initial report of the claim that it needed further time to investigate. Indeed, given the utterly preposterous position it has taken in its "denial" letter, it could have made such a determination within days of the initial report.

107.   Lloyds' actions have been consistent with foot-dragging and dilatory intentions in an effort to force litigation and/or cause substantial harm to Oxford.

108.   As a direct and proximate result of Defendant Lloyds' bad faith claims handling Oxford is entitled to compensatory damages, punitive damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

## COUNT V
### (*Declaratory Judgment – Stewart*)

109.   Plaintiff incorporates the preceding allegations as if fully rewritten herein.

110.   On April 15, 2008, Stewart issued a Closing Protection Letter/Insured Closing Letter ("CPL") to Oxford in relation to the subject Shelton loan. (Exhibit R). Placer was the Issuing Agency. The property address is 3320 Wilson Place, Oakland, California 94602, which is the subject property of the Shelton loan.

111.     The CPL provides that Stewart will reimburse Oxford for loss of settlement funds incurred by Oxford in connection with the closing of the real estate transaction. The loss must arise from:

1.     Failure of the Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to that interest in land or the validity, enforceability and priority of the lien of the mortgage on that interest in land, including the obtaining of documents and the disbursement of funds necessary to establish the status of title or lien, or (b) the obtaining of any other document, specifically required by you, but only to the extent the failure to obtain the other document affects the status of the title to that interest in land or the validity, enforceability and priority of the lien of the mortgage on that interest in land, and not to the extent that your instructions require a determination of the validity, enforceability or the effectiveness of the other document, or

2.     Fraud, dishonesty or negligence of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with the closings to the extent that fraud, dishonesty or negligence relates to the status of the title to that interest in land or to the validity, enforceability, and priority of the lien of the mortgage on that interest in land.

(Exhibit R)

112.     The CPL contains eight (8) enumerated conditions and/or exclusions. All of the conditions for coverage have been satisfied. None of the exclusions from coverage apply to this loss.

113.     Oxford presented its demand under the CPL to Stewart on February 26, 2009, which is within one year of the date of closing of the subject Shelton loan.

114.     The Issuing Agent, Placer, failed to follow the closing instructions in several aspects. It altered the closing documents to reflect proceeds were being paid to entities not identified in the original loan documents (namely Corporations, Inc., which is not an actual company but a straw corporation used to perpetrate a fraud on Oxford). It also allowed Munir to pay the approximately $95,000 down payment.

115.   Jacqueline Shelton's signature was forged on numerous loan documents, which may destroy any title Shelton would have in the subject property.

116.   At no time did Placer, the Issuing Agent, notify Oxford prior to the closing that it was altering closing documents. If Placer had informed Oxford of such an event, the loan would have been re-underwritten, and it would not have been approved.

117.   Placer fraudulently, dishonestly, and/or negligently handled the closing funds and/or documents, all of which relates to the status of the title and/or the validity, enforceability, and/or priority of the lien.

118.   Oxford has sustained a loss of settlement funds in that it disbursed $675,990.00 to fund the purchase of the property, as well as interest that has accrued on the mortgage loan.

119.   Oxford's loss is related to the failure to follow the closing instructions, fraud, and/or forgery on loan documents.

120.   Pursuant to the terms of the CPL, Oxford is entitled to declaratory judgment establishing that Stewart has an obligation to defend and indemnify Oxford for any liability it has to indemnify Flagstar for its loss, which shall include the outstanding balance owed on the Note plus all interest and costs of collection, including attorney fees. Stewart is further obligated to indemnify Oxford for all legal fees it has incurred in litigating and/or resolving this matter.

COUNT VI
(*Breach of Contract – Stewart*)

121.   Plaintiff incorporates the preceding allegations as if fully rewritten herein.

122.   Oxford has received the CPL from Stewart dated April 15, 2008 providing protection from losses that were covered pursuant to the terms of the CPL.

29

123.    Oxford has sustained a loss as a result of Placer's failure to follow the closing instructions, forged signatures and/or fraudulent alteration of real estate documents and other documents.

124.    By disbursing the loan proceeds, Oxford has sustained a loss of settlement funds, including interest that has accrued since the date of the loan closing.

125.    Stewart has a contractual obligation to indemnify Oxford for covered losses sustained.

126.    Stewart has denied Oxford's claim and has failed to indemnify Oxford pursuant to its obligation set forth in the CPL.

127.    Stewart has breached the contract by failing to satisfy its obligation to indemnify Oxford in this matter.

128.    As a direct and proximate result of Defendant Stewart's breach of contract Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

COUNT VII
(*Breach of Contract – Placer*)

129.    Plaintiff incorporates the preceding allegations as if fully rewritten herein.

130.    Placer entered into a contract to provide closing and escrow services for Oxford in relation to the Shelton loan.

131.    As part of its contract, Placer agreed that it would represent Oxford at the closing of the Shelton loan, that it would ensure that Shelton was who she purported to be, that the closing would occur without alteration of documents, that it would follow all closing instructions provided to it by Oxford, that it would accept the down payment only

from Shelton, and it would only disburse funds to the persons and/or entities identified on

the approved HUD statement and approved by Oxford.

132.    The loan closing instructions (attached as Exhibit S) provides in pertinent

part:

Enclosed you will find the closing package for the above referenced borrow. As the closing/settlement agent you agree to close this loan based on the following instructions:

A.    HUD-1 Settlement Statement – A standard final HUD-1 Settlement Statement or HUD-1A Settlement Statement (if applicable) must be completed and signed by the Borrowers, Sellers (if applicable), and Closing Agent representative.

•    Refer to the Preliminary HUD-1 Settlement Statement included in the closing package for the pertinent fee information.

YOU MUST NOT CHANGE OR RENAME ANY FEE, LINE ITEM, OR SERVICE PROVIDER LISTED ON THE PRELIMINARY HUD-1 SETTLEMENT STATEMENT PROVIDED IN THE CLOSED LOAN PACKAGE. IF YOU CHANGE ANY OF THE FEES LISTED ON THE PRELIMINARY HUD-1 SETTLEMENT STATEMENT, YOU WILL BE HELD RESPONSIBLE FOR ANY RESTITUTION THAT MUST BE MADE TO THE BORROWER AND ANY REDSCLOSURE THAT MAY BE REQUIRED.

* * *

B.    Truth-In-Lending Disclosure – The final Truth-In-Lending Disclosure must reflect the fees that are listed on the final HUD-1 or HUD-1A Settlement Statement. If there is a change in the fees from what was provided by the Lender, please contact the Closer/Loan Originator, because a new Truth-In-Lending Disclosure and Itemization of Amount Financed will be required.

ALL FEES AND CHARGES MUST BE ACCURATELY DISCLOSED AS PART OF THE TRUTH-IN-LENDING REQUIREMENTS. IF YOU ADD OR MODIFY ANY FEES LISTED ON THE HUD-1 OR HUD-1A SETTLEMENT STATEMENT INCLUDED IN THIS CLOSING PACKAGE YOU MUST NOTIFY THE CLOSER/LOAN ORIGINATOR TO REQUEST A NEW CLOSING PACAKGE WITH THE UPDATED FEES.

* * *

P.    Please read the SPECIFIC CONDITIONS that are made part of these Closing Instructions for any other outstanding conditions that must be met prior to closing this loan. If there are any necessary items missing from the closing package, please contact the Closer/Loan Originator immediately.

*****SPECIFIC CONDITIONS*****

\* \* \*

03. NOTE: THIS LOAN APPROVED WITH RATIOS CAPPED AT 50/50 – ANY CHANGES MADE TO LOAN MUST BE RE-REVIEWED BY UNDERWRITER FOR APPROVAL. – ALSO, NO NEW SUBORDINATION FOR FUNDS TO CLOSE ALLOWED FOR FHA PRODUCT

\* \* \*

08. Seller Contributions not to exceed ${4000} or loan must be re-underwritten and commitment may be null and void. No additional lender credits, or seller concessions that have not been approved by Flagstar are not permitted. Seller carrybacks, payment assistance or side agreements not disclosed to the lender are not permitted.

\* \* \*

17. Borrower's Cash Used for Closing, Net of the Original Real Estate Broker's Deposit (if applicable), Cannot exceed ${90,000}.

\* \* \*

29. This loan has been submitted with zero seller contributions. If seller contributions are present, the loan must be resubmitted to underwriting for review. If not, this commitment may be null and void. No additional lender credits, or seller concessions that have not been approved by Flagstar are permitted. Seller carrybacks, payment assistance or side agreements not disclosed to the lender are not permitted.

(Exhibit S).

133.    Placer altered the closing documents; allowed someone other than the borrower to pay the down payment; disbursed funds that resulted in improper kickbacks to Tapscott, Munir, and potentially others; allowed the cash used for closing to exceed the permissible amount; allowed the seller's contribution to exceed the permissible amount;

allowed documents to be forged; and failed to notify Flagstar and/or Oxford of the changes so that the loan could be re-underwritten as required.

134.    Placer's actions in handling the closing of the Shelton loan was in direct violation of its obligations set forth in the Closing Instructions and constitutes a breach of the contract.

135.    As a direct and proximate result of Defendant Placer's breach of contract Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

COUNT VIII
(*Breach of Fiduciary Duty – Placer*)

136.    Plaintiff incorporates the preceding allegations as if fully rewritten herein.

137.    Placer and Oxford understood and intended to create a fiduciary relationship whereby Oxford placed a special trust or confidence in Placer to ensure that the closing instructions were followed; that Shelton was who she purported to be; that Shelton sign the documents; that no loan documents be altered; and that Shelton, Munir, and Tapscott not commit fraud against Oxford.

138.    Placer understood that due to Oxford's location in Ohio is was impossible for Oxford to protect its interest without Placer's services.

139.    Placer holds itself out as a loan closing and escrow agency whereby it will provide loan closing and escrow services on behalf of lenders across the country, and as such stands as the last and potentially only line of defense against fraud.

140.    By allowing Shelton, Munir, and Tapscott to commit fraud, by disbursing funds to unauthorized entities, by altering the loan closing documents, by allowing someone

other than Shelton make the down payment, and by failing and/or refusing to follow the loan closing instructions Placer breached its fiduciary duty to Oxford.

141.   Placer's breach of fiduciary duty is the proximate cause of the harm sustained by Oxford.

142.   As a direct and proximate result of Defendant Placer's breach of fiduciary duty Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

COUNT IX
(*Negligence – Placer*)

143.   Plaintiff incorporates the preceding allegations as if fully rewritten herein.

144.   As the closing agent, even if Placer did not have a fiduciary relationship with Oxford, it owed Oxford a duty as a matter of law to ensure that the closing instructions were followed; that Shelton was who she purported to be; that Shelton sign the documents; that no loan documents be altered; and that Shelton, Munir, and Tapscott not commit fraud against Oxford.

145.   Placer understood that due to Oxford's location in Ohio is was impossible for Oxford to protect its interest without Placer's services.

146.   Placer holds itself out as a loan closing and escrow agency whereby it will provide loan closing services on behalf of lenders across the country, and as such stands as the last and potentially only line of defense against fraud.

147.   By allowing Shelton, Munir, and Tapscott to commit fraud, by disbursing funds to unauthorized entities, by altering the loan closing documents, by allowing someone other than Shelton make the down payment, and by failing and/or refusing to follow the

loan closing instructions Placer breached its duties owed to Oxford and was negligent in fulfilling its role as loan closing and escrow agent.

148.    Placer's negligence is the proximate cause of the harm sustained by Oxford.

149.    As a direct and proximate result of Defendant Placer's Negligence Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

COUNT X
(*Breach of Contract – Works*)

150.    Plaintiff incorporates the preceding allegations as if fully rewritten herein.

151.    In or about March, 2008, Works was contacted by Oxford to prepare an appraisal of real property for the property located at 3320 Wilson Place, Oakland, California, the location of the property being "purchased" by Shelton.

152.    Works and Oxford entered into an oral contract whereby Works would prepare and provide Oxford with an appraisal of the subject property using acceptable appraisal practices. Acceptable appraisal practices include taking into consideration the unique characteristics of the subject property and the surrounding neighborhood. Acceptable appraisal practices further include utilizing comparable sales of real estate in the same neighborhood, or a neighborhood of similar quality, marketability, and/or desirability. Upon obtaining comparable sales for evaluation, acceptable appraisal practices require that adjustments be made for the subject property given the unique characteristics of the subject property.

153.    Works prepared and provided its appraisal to Oxford on or about April 4, 2008. (Exhibit T). The appraisal prepared by Works reflected an appraised value of $739,000 for the subject property.

154.   In reliance on the appraisal, Oxford and Flagstar approved Shelton's mortgage loan application.

155.   Following Shelton's default on the mortgage loan, Oxford obtained a "review" appraisal with an effective date of April 3, 2008. (Exhibit U). The "review" appraisal established that the true market value for the subject property at the time of the "purchase" was $500,000. Oxford and Flagstar would not have approved the Shelton mortgage loan application if Works had provided Oxford with the correct appraised value of $500,000.

156.   Works' appraisal failed to utilize acceptable appraisal practices in that Works' was unduly influenced by the inflated sales price reflected on the purchase contract between Shelton and Tapscott.

157.   Works' appraisal failed to utilize acceptable appraisal practices in that it relied on "comparable" sales transactions from neighboring areas of Oakland, which are far more marketable and valuable than the neighborhood in which the subject property was located. Works used "comparable" sales from the Diamond and Laurel districts of Oakland, which are substantially superior neighborhoods to the one in which the subject property is situated. Works failed to take into consideration the unique characteristics of the subject property, which dramatically reduced the value of the subject property over the "comparable" sales used in the appraisal.  For example, Works failed to take into consideration that the subject property was located directly beside an interstate freeway, which reduces the value of the property.

158.   As a direct and proximate result of Defendant Works' breach of contract Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

36

COUNT XI
(*Negligence – Works*)

159.    Plaintiff incorporates the preceding allegations as if fully rewritten herein.

160.    In or about March, 2008, Works was contacted by Oxford to prepare an appraisal of real property for the property located at 3320 Wilson Place, Oakland, California, the location of the property being "purchased" by Shelton.

161.    Even in the absence of a contract, Works has a legal duty owed to Oxford to prepare appraisals using acceptable appraisal practices. Acceptable appraisal practices include taking into consideration the unique characteristics of the subject property and the surrounding neighborhood. Acceptable appraisal practices further include utilizing comparable sales of real estate in the same neighborhood, or a neighborhood of similar quality, marketability, and/or desirability. Upon obtaining comparable sales for evaluation, acceptable appraisal practices require that adjustments be made for the subject property given the unique characteristics of the subject property.

162.    Works prepared and provided its appraisal to Oxford on or about April 4, 2008. (Exhibit T). The appraisal prepared by Works reflected an appraised value of $739,000 for the subject property.

163.    In reliance on the appraisal, Oxford and Flagstar approved Shelton's mortgage loan application.

164.    Following Shelton's default on the mortgage loan, Oxford obtained a "review" appraisal with an effective date of April 3, 2008. (Exhibit U). The "review" appraisal established that the true market value for the subject property at the time of the "purchase" was $500,000. Oxford and Flagstar would not have approved the Shelton

mortgage loan application if Works had provided Oxford with the correct appraisal value of $500,000.

165.   Works' appraisal failed to utilize acceptable appraisal practices in that Works was unduly influenced by the inflated sales price reflected on the purchase contract between Shelton and Tapscott.

166.   Works' appraisal failed to utilize acceptable appraisal practices in that it relied on "comparable" sales transactions from neighboring areas of Oakland, which are far more marketable and valuable than the neighborhood in which the subject property was located. Works used "comparable" sales from the Diamond and Laurel districts of Oakland, which are substantially superior neighborhoods to the one in which the subject property is situated. Works failed to take into consideration the unique characteristics of the subject property, which dramatically reduced the value of the subject property over the "comparable" sales used in the appraisal. For example, Works failed to take into consideration that the subject property was located directly beside an interstate freeway, which reduces the value of the property.

167.   As a direct and proximate result of Defendant Works' Negligence Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

## COUNT XII
### (*Breach of Contract – Williams*)

168.   Plaintiff incorporates the preceding allegations as if fully rewritten herein.

169.   In or about March, 2008, Williams was contacted by Oxford to prepare an appraisal of real property for the property located at 3320 Wilson Place, Oakland, California, the location of the property being "purchased" by Shelton.

170.   Williams and Oxford entered into a contract whereby Williams would prepare and provide Oxford with an appraisal of the subject property using acceptable appraisal practices. Acceptable appraisal practices include taking into consideration the unique characteristics of the subject property and the surrounding neighborhood. Acceptable appraisal practices further include utilizing comparable sales of real estate in the same neighborhood, or a neighborhood of similar quality, marketability, and/or desirability. Upon obtaining comparable sales for evaluation, acceptable appraisal practices require that adjustments be made for the subject property given the unique characteristics of the subject property.

171.   Williams prepared and provided its appraisal to Oxford on or about April 4, 2008. (Exhibit V). The appraisal prepared by Williams reflected an appraised value of $740,000 for the subject property.

172.   In reliance on the appraisal, Oxford and Flagstar approved Shelton's mortgage loan application.

173.   Following Shelton's default on the mortgage loan, Oxford obtained a "review" appraisal with an effective date of April 3, 2008. (Exhibit U). The "review" appraisal established that the true market value for the subject property at the time of the "purchase" was $500,000. Oxford and Flagstar would not have approved the Shelton mortgage loan application if Williams had provided Oxford with the correct appraisal value of $500,000.

174.   Williams' appraisal failed to utilize acceptable appraisal practices in that Williams was unduly influenced by the inflated sales price reflected on the purchase contract between Shelton and Tapscott.

175.    Williams' appraisal failed to utilize acceptable appraisal practices in that it relied on "comparable" sales transactions from neighboring areas of Oakland, which are far more marketable and valuable than the neighborhood in which the subject property was located. Williams used "comparable" sales from the Diamond and Laurel districts of Oakland, which are substantially superior neighborhoods to the one in which the subject property is situated. Williams failed to take into consideration the unique characteristics of the subject property, which dramatically reduced the value of the subject property over the "comparable" sales used in the appraisal. For example Williams failed to take into consideration that the subject property was located directly beside an interstate freeway, which reduces the value of the property.

176.    As a direct and proximate result of Defendant Williams' breach of contract Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

## COUNT XIII
### (*Negligence – Williams*)

177.    Plaintiff incorporates the preceding allegations as if fully rewritten herein.

178.    In or about March, 2008, Williams was contacted by Oxford to prepare an appraisal of real property for the property located at 3320 Wilson Place, Oakland, California, the location of the property being "purchased" by Shelton.

179.    Even in the absence of a contract, Williams has a legal duty owed to Oxford to prepare appraisals using acceptable appraisal practices. Acceptable appraisal practices include taking into consideration the unique characteristics of the subject property and the surrounding neighborhood. Acceptable appraisal practices further include utilizing comparable sales of real estate in the same neighborhood, or a neighborhood of similar

quality, marketability, and/or desirability. Upon obtaining comparable sales for evaluation, acceptable appraisal practices require that adjustments be made for the subject property given the unique characteristics of the subject property.

180.    Williams prepared and provided its appraisal to Oxford on or about April 4, 2008. (Exhibit V). The appraisal prepared by Williams reflected an appraised value of $740,000 for the subject property.

181.    In reliance on the appraisal, Oxford and Flagstar approved Shelton's mortgage loan application.

182.    Following Shelton's default on the mortgage loan, Oxford obtained a "review" appraisal with an effective date of April 3, 2008. (Exhibit U). The "review" appraisal established that the true market value for the subject property at the time of the "purchase" was $500,000. Oxford and Flagstar would not have approved the Shelton mortgage loan application if Williams had provided Oxford with the correct appraisal value of $500,000.

183.    Williams' appraisal failed to utilize acceptable appraisal practices in that Williams was unduly influenced by the inflated sales price reflected on the purchase contract between Shelton and Tapscott.

184.    Williams' appraisal failed to utilize acceptable appraisal practices in that it relied on "comparable" sales transactions from neighboring areas of Oakland, which are far more marketable and valuable than the neighborhood in which the subject property was located. Williams used "comparable" sales from the Diamond and Laurel districts of Oakland, which are substantially superior neighborhoods to the one in which the subject property is situated. Williams failed to take into consideration the unique characteristics of the subject property, which dramatically reduced the value of the subject property over the

"comparable" sales used in the appraisal.   For example, Williams failed to take into consideration that the subject property was located directly beside an interstate freeway, which reduces the value of the property.

185.   As a direct and proximate result of Defendant Williams' negligence Oxford is entitled to compensatory damages, attorneys fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

## COUNT XIV
### (*Fraud/Conspiracy to Commit Fraud – Shelton, Munir, and Tapscott*)

186.   Plaintiff incorporates the preceding allegations as if fully rewritten herein.

187.   From January 2008 through April 2008, Shelton, Munir, and Tapscott perpetrated a fraud scheme whereby they would orchestrate the "sale" of a home using funds that would be "borrowed" from Oxford to pay for the "purchase" of the home and compensate various participates in the scheme.

188.   Prior to the fraud activities, Tapscott built a residential home at 3320 Wilson Place, Oakland, California. In order to purchase the site and construct the home, Tapscott obtained a loan in the amount of approximately $500,000.00. Tapscott's mortgage loan was with Washington Mutual at the time of the closing of the subject Shelton loan and had a payoff loan balance of $497,885.99.

189.   Due to the decline in the residential real estate market, or due to other currently unknown factors, Tapscott was unable to sell the home for the asking price of approximately $740,000.

190.   Desiring to unload the property, but without having a buyer, Tapscott coordinated with Munir and/or Shelton whereby Shelton would "purchase" the home for $739,000. (Exhibit W).

191.    Recognizing that Shelton was entirely unqualified and unable to "purchase" the home, Tapscott, Munir, and Shelton created a fictitious persona for Shelton.

192.    Tapscott, Shelton, and Munir created false bank records that purported to establish that Shelton had a money market account with "Franklin's Investment Group" with an account balance of $179,653.89 as of December 15, 2007. (Exhibit X).

193.    There is no such entity known as "Franklin's Investment Group" in Liburn, Georgia as purported on the account statement. Tapscott, Munir, and Shelton created this fictitious company with the intent to deceive Oxford and Flagstar into believing the account was held with Franklin Templeton Investments or some other legitimate investment group.

194.    The phone number on the account statement is not a working phone number. The social security number on the account statement may not be Shelton's social security number, the "deferral money market account" number is entirely fictitious. The address reflects "Liburn, GA" which does not exist. It appears the co-conspirators intended to reflect an address in Lilburn, GA, which does exist.

195.    Oxford sent a "Request for Verification of Deposit" to Franklin's Investment Company, which was completed by a person purporting to be "Beverly Hall" on or about January 19, 2008. (Exhibit Y). The information provided by "Ms. Hall" reflects a money market account number of "***974" which is not the same as that reflected on the Franklin's Investment Group account statement wherein the account number was "***71". (Exhibit X)[3]. The "Current Balance" as of January 19, 2008 was $179,653.89 on the Verification form. (Exhibit Y). The account balance reflected on the account statement was also $179,653.89 even though it was dated one month earlier and even though the funds

---

[3] As noted earlier, certain information has been redacted. Unredacted documents are available to the parties and will be filed under seal upon Court Order. Although the account numbers are believed to be fake or invalid, out of an abundance of caution, the information is being edited and redacted.

were being held in securities thereby establishing that the account value will fluctuate daily. (Exhibit X).

196.    Tapscott, Munir, and Shelton falsified Shelton's social security card by covering up an existing social security number and replacing the number with a different number and by placing what appears to be a possible forged signature for Shelton. (Exhibit Z).

197.    A LexisNexis report obtained by Oxford reflects that an individual by the name of "T. Faniel" has also used the social security number that was being used by Shelton. (Exhibit AA). The report further shows that the social security number was issued in Florida.

198.    During the underwriting process, Oxford ran a credit check on Shelton using Equifax Mortgage Solutions. (Exhibit BB). The report, dated February 7, 2008, reflects Shelton as being 48 years old; thus her date of birth should be somewhere between February 7, 1959 and February 6, 1960. The report's "File Verification" shows two different dates of birth for Shelton, or her aliases, which were April 26, 1969 (which would make Shelton 38 years old) and September 9, 1955 (which would make her 52 years old). The report's "Comments" notes that the social security number was not verified and that it was issued in 1997 in the state of Florida.

199.    Pursuant to Shelton's "driver's license," or at least the document produced by Shelton or one of her co-conspirators, Shelton's date of birth was September 9, 1955. (Exhibit CC). Thus, if that was her date of birth, she would have been 52 when she applied for the loan.

200.    Even though Shelton's "driver's license" reflects a date of birth of September 9, 1955, a Uniform Residential Loan Application was prepared by Shelton, or one of her co-

conspirators purporting to be Shelton, which reflected a date of birth of April 26, 1959. (Exhibit DD).

201.    Recognizing Shelton needed a "job" and "income" in order to qualify for a nearly $700,000 mortgage loan, the co-conspirators created a "job" for Shelton at Elijah Painting Company, Inc. (Exhibit EE).

202.    The "pay stub" provided by Shelton was dated January 15, 2008 (which was a Tuesday). The date is in a different font and format than the rest of the "pay stub." It reflects earnings for the period of $4,677.82. It reflects year to date earnings of $9,355.64. Given the "pay stub" is dated January 15, 2008, it is evident that it is designed to reflect two pay periods. However, the "pay stub" reflects that Shelton's hours ("Regular Hours") for the pay period are 80.00 hours. Thus, this is a bi-monthly "pay stub" reflecting fictitious income. (Exhibit EE).

203.    As further evidence that the "pay stub" is fictitious, the person purporting to be "Jane Cone" verified in the Verification of Employment that Shelton was paid "bi-weekly." If she were to be paid bi-weekly, she would not have been paid on January 15, 2008 (a Tuesday). The "pay stub" reflects bi-monthly payments in one part (payment on the 15th of the month), bi-weekly in another (the 80 hours worked), and weekly in another (the year to date earnings is double what it should have been). (Exhibit EE).

204.    The address for Elijah Painting Co. reflected on the "pay stub," and all other documents relating to Elijah Painting Co., was 1485 Bayshore Drive, San Francisco, California, 94124. (Exhibit EE). The address for the real Elijah Painting Co. appears to be 3801 3rd Street, Suite 616, San Francisco, California, 94124. The State and Federal Employer Identification Numbers, upon information and belief, are false or invalid.

205.   The W-2 statement for 2007 reflects Shelton's total wages as being $128,632.32, but her social security wages were reported as only $900. Yet, social security taxes withheld was $4724. Her Medicare wages and tips was $128,632.32 and her Medicare tax withheld was $1865.17. These figures are not accurate with the federal tax schedule for social security and Medicare. (Exhibit EE). This is a fictitious W-2 statement that was prepared by Shelton, Munir, or Tapscott with the intent to deceive Oxford and Flagstar.

206.   Shelton, Munir, and Tapscott were not quite as careless in creating the fictitious 2006 W-2 statement as the social security wages for 2006 was $90,000 and the social security taxes were $5,580. (Exhibit EE). Although without the glaring deficiencies, this too is a fictitious W-2 statement prepared by Shelton, Munir, and Tapscott with the intent to deceive Oxford and Flagstar.

207.   The "Verification of Employment" sent by Oxford to Elijah Painting Co. was completed by an individual purporting to be "Jane Cone." According to the Verification, Shelton began working at Elijah Painting in March, 1993 (15 years ago). (Exhibit EE). Shelton's loan application reflects that she allegedly worked for Elijah Painting for 18 years. (Exhibit DD).

208.   During the application process and at closing, it is evident that the signature of "Jacqueline Shelton" was forged in numerous places. By inspecting the driver's license, social security number certification, and "signed" letter, it is evident that there are no less than three (3) distinctly different signatures for "Jacqueline Shelton." (Exhibit CC and FF).

209.   Given the forged signatures that have been affixed to numerous documents, there may not have ever been a valid transfer of title from Tapscott to Shelton. Without a valid transfer of title, Oxford and Flagstar do not have valid mortgages or liens.

210.   The fraud was not complete, however, with the approval of the mortgage loan by Oxford and Flagstar. The co-conspirators needed to reap the benefits of their scheme. Munir paid Shelton's down payment with a Certified Check reflecting the name of the remitter as being Arketha Munir. (Exhibit GG). Thus, Munir paid $95,207.01. At the culmination of the closing, Shelton received possession of the property and has lived there for nearly two years without paying one mortgage loan payment. Munir received the majority, if not the entirety, of the proceeds that were paid to the fictitious "Corporations, Inc." Taking into account her down payment, Munir netted a profit of approximately $54,792.99 from this scam. Tapscott was able to dump a home he could not sell, paid off his outstanding mortgage on the property, and received a check for $74,369.91reflecting his profit in the deal. (Exhibit GG).

211.   As a direct and proximate result of Defendants Shelton's, Munir's, and Tapscott's fraud and conspiracy to commit fraud each Defendant is jointly and severally liable to Oxford for compensatory damages, punitive damages, attorney fees, costs, and any other remedy available to it as a matter of law or in equity in an amount greater than $75,000.00.

WHEREFORE, plaintiff Oxford Lending Group, LLC demands judgment in its favor against all defendants as follows:

1.   As against Defendant Underwriters at Lloyd's, London, declaratory judgment establishing Lloyds' obligation to defend and indemnify Oxford pursuant to the Bond and Policy, as well as, compensatory damages, punitive damages, attorney fees, costs, and any other remedy to which Plaintiff Oxford Lending Group, LLC is entitled as a matter of law or in equity in an amount in excess of $75,000.00

2.    As against Defendant Stewart Title Guaranty Company, declaratory judgment establishing Stewart's obligation to defend and indemnify Oxford pursuant to the Closing Protection Letter, as well as, compensatory damages, attorney fees, costs, and any other remedy to which Plaintiff Oxford Lending Group, LLC is entitled as a matter of law or in equity in an amount in excess of $75,000.00

3.    As against Defendant Placer Title Company, compensatory damages, attorney fees, costs, and any other remedy to which Plaintiff Oxford Lending Group, LLC is entitled as a matter of law or in equity in an amount in excess of $75,000.00

4.    As against Defendant The Appraisal Works, compensatory damages, attorney fees, costs, and any other remedy to which Plaintiff Oxford Lending Group, LLC is entitled as a matter of law or in equity in an amount in excess of $75,000.00

5.    As against Defendant Williams Appraisal Services, compensatory damages, attorney fees, costs, and any other remedy to which Plaintiff Oxford Lending Group, LLC is entitled as a matter of law or in equity in an amount in excess of $75,000.00

6.    As against Defendants Jacqueline Shelton, Arketha Munir, and Trevor Tapscott, jointly and severally, compensatory damages, punitive damages, attorney fees, costs, and any other remedy to which Plaintiff Oxford Lending Group, LLC is entitled as a matter of law or in equity in an amount in excess of $75,000.00

Respectfully submitted,

CARLILE PATCHEN & MURPHY LLP


By: /s/Matthew S. Brown
H. Ritchey Hollenbaugh (0001072)
hrh@cpmlaw.com
Matthew S. Brown (0077687)
Trial Attorney
msb@cpmlaw.com
Robert T. Castor (0082566)
rtc@cpmlaw.com
366 East Broad Street
Columbus, Ohio 43215
Tele:   (614) 228-6135
Fax:    (614) 221-0216
*Attorneys for Oxford Lending Group, LLC*


<u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues presented herein.


/s/Matttew S. Brown
Matthew S. Brown

MSB/MSB/831163.1
220194.005